**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 3:94-CR-112 (JCH) |
| | : | |
| LUIS NOEL CRUZ, | : | |
| Defendant. | : | APRIL 9, 2021 |

**RULING RE: MOTION FOR SENTENCE REDUCTION UNDER**
**THE FIRST STEP ACT (DOC. NO. 2265)[1]**

## I.    INTRODUCTION

Nearly twenty-seven years ago, an eighteen-year-old Luis Noel Cruz ("Cruz") murdered two young men in Bridgeport, Connecticut.  For these and other crimes he was convicted by a jury and sentenced to life in prison without the possibility of parole.  Now 45 years old, Cruz has effectively served almost 31 years of that life sentence.

Cruz now moves this court to reduce his sentence pursuant to section 3582(c) of title 18 of the United States Code.  He bases his request on several factors.  Specifically, he argues that his age at the time of his crimes, the length of his sentence, his extraordinary rehabilitation, the COVID-19 pandemic, and his family circumstances constitute "extraordinary and compelling reasons" to reduce his sentence under the statute.  The Government opposes Cruz's Motion.

For the reasons that follow, the court grants Cruz's Motion.

---

[1] Cruz styled his Motion as "Motion for Compassionate Release", as motions pursuant to section 3582(c) are commonly called.  This term, however, is a misnomer.  United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020).  As the Second Circuit observed in Brooker, section 3582(c) "speaks of sentence reductions," and a district court "could . . . reduce but not eliminate a defendant's prison sentence."  Id. Accordingly, the court will refer to Cruz's Motion as a motion for sentence reduction.

## II.    BACKGROUND

### A.    Factual Background

Born on December 25, 1975, Cruz was 15 years old when he joined the Latin

Kings, a violent street gang in Connecticut engaged in narcotics trafficking and other

criminal activity.  See Second Superseding Indictment (Doc. No. 625) ¶¶ 3, 10-12;

Presentence Investigation Report ("PSR 2018") (Doc. No. 2072) ¶ 94; U.S. v. Diaz, 176

F.3d 52, 74-75 (2d Cir. 1999).

On May 14, 1994, when Cruz was 18 years old, he and another member of the

Latin Kings, Alexis Antuna ("Antuna"), were ordered by gang leader Richard Morales to

kill Arosmo "Ra-Ra" Diaz ("Diaz"), a fellow gang member whom Latin King leadership

believed was an informant.  See Diaz, 176 F.3d at 83-84; see also Cruz v. United

States, Case No. 3:11-CV-00787 (JCH) (D. Conn.), Transcript of Second Evidentiary

Hearing ("Cruz Tr.") (Doc. No. 114) at 17:16-18:22.  The order was delivered to Cruz by

his Latin Kings "sponsor".  Cruz Tr. at 18:4-14.  When Cruz told his sponsor that he did

not want to kill anyone, the sponsor informed him that Cruz's earlier efforts to leave the

Latin Kings had been taken as disrespect and that leadership was debating what to do

with him.  Id. at 18:23-19:4.  When Cruz continued to insist that he did not want to kill

anyone, his sponsor fired a gun into the air, which Cruz understood to mean that he

would be killed if he failed to carry out Morales's order.  Id. at 19:5-22.

Acting on Morales's order that same night, Cruz and Antuna got into a car being

driven by an unsuspecting Diaz.  Id. at 44:25-45:9.  Diaz's friend, Tyler White ("White"),

was with him in the passenger seat.  Id.  The four of them then drove to Jane Street in

Bridgeport, Connecticut, with Cruz seated behind White and Antuna seated behind

Diaz.  Id. at 48:23-49:2.  At some point after arriving at Jane Street, and still seated on

2

the rear passenger side of the car, Cruz shot White twice in the back of the head, killing him instantly.  Id. at 49:3-51:9; see also PSR 2018 ¶¶ 19-20, 22, 45.  Cruz then exited the vehicle to help Antuna chase down the fleeing Diaz; Cruz held Diaz down as Antuna shot him multiple times in the head and torso, killing him.  See Cruz Tr. 51:10-53:1; PSR 2018 ¶¶ 19-20, 23, 45; see also Diaz, 176 F.3d at 84.

B.    Procedural Background

In December 1994, a grand jury indicted Cruz for, among other things, three Violent Crimes in Aid of Racketeering ("VCAR"), in violation of section 1959(a) of title 18 of the United States Code.  Cruz v. United States, Case No. 3:11-CV-00787 (JCH) (D. Conn.), Successive Petition to Vacate, Ex. 1, Superseding Indictment ¶¶ 75-81 (Doc. No. 37-1); see also Second Superseding Indictment ¶¶ 74-79.  The three VCAR crimes were the conspiracy to murder Diaz (Count 24), the murder of Diaz (Count 25), and the murder of White (Count 26).  Second Superseding Indictment ¶¶ 74-79.

On September 29, 1995, following a trial by jury, Cruz was convicted on all three VCAR counts, in addition to violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), conspiracy to violate RICO, and conspiracy to commit a drug offense.  Verdict Form (Doc. No. 945); Judgment (Doc. No. 1072) at 1.

On January 30, 1996, Cruz was sentenced to, inter alia, four concurrent terms of life imprisonment without parole for the two VCAR murders, the RICO violation, and the conspiracy to violate RICO.[2]  Judgment at 2.

_____

[2] The Sentencing Guidelines in effect at the time of Cruz's sentencing mandated life imprisonment for the VCAR murders in Counts 25 and 26.  See U.S. Sentencing Guidelines Manual §§ 2A1.1 & n.1, 2E1.3(a)(2) (1995).  However, the governing statute at the time Cruz committed his offenses did not.  See 18 U.S.C. § 1952B (1984) (providing that VCAR murder "shall be punished . . . by

3

On May 4, 1999, the Second Circuit affirmed Cruz's conviction on appeal.  See Diaz, 176 F.3d at 73.  Cruz subsequently filed four habeas petitions under section 2255 of title 28 of the United States Code, from 2001 to 2013, each of which was denied.  Ruling Re: Successive Petition to Vacate, Set Aside, or Correct Sentence ("Ruling") (Doc. No. 2063) at 4.

On July 22, 2013, the Second Circuit granted a request by Cruz to file a fifth successive habeas petition under section 2255 to raise a claim based on Miller v. Alabama, 567 U.S. 460 (2012).  Cruz v. United States, Case No. 3:11-CV-00787 (JCH) (D. Conn.), USCA Certified Order (Doc. No. 16).  In Miller, the Supreme Court held that, for persons under eighteen ("juveniles") at the time of their crime, a mandatory life sentence without parole violated the Eight Amendment's prohibition on cruel and unusual punishment.  Miller, 567 U.S. at 465.

Cruz filed his Petition in this court on August 19, 2014.  Cruz v. United States, Case No. 3:11-CV-00787 (JCH) (D. Conn.), Successive Petition to Vacate, Set Aside, or Correct Sentence ("Pet. to Vacate") (Doc. No. 37).  In it, he argued that Miller's prohibition of mandatory life imprisonment for juveniles should apply to those who were eighteen at the time of their offense.  See Pet. to Vacate at 10-22.

---

imprisonment for any term of years or for life"), renumbered § 1959 by Pub. L. No. 100-690, 102 Stat. 4181, Title VII, § 7053(b) (Nov. 18, 1988); see also Pub. L. No. 103-322, 108 Stat. 1796, Title VI, § 60003(a)(12) (Sept. 13, 1994) (amending section 1959(a)(1) subsequent to Cruz's offenses to require "death or life imprisonment" as punishment for VCAR murder). The PSR nonetheless erroneously stated that life imprisonment was mandated under the statute.  1996 Presentence Report at 1 & ¶ 81.

The parties disagree over whether the sentencing judge became aware of the 1996 Presentence Report's error and thus whether he sentenced Cruz under the misimpression that life imprisonment was mandated by statute.  It is not clear to the court that the sentencing judge was indeed aware of this error, as the Government argues.  There was no correction to the 1996 Presentence Report at sentencing, as is generally the practice when an error is identified.  However, the question is of no consequence to this Ruling.  Clearly, the Guidelines in effect at the time of Cruz's sentencing called for life imprisonment, and they were mandatory at the time.  See United States v. Booker, 543 U.S. 220, 233 (2005) ("The Guidelines as written, however, are not advisory; they are mandatory and binding on all judges.").

On September 13, 2017, this court[3] held an evidentiary hearing at which Dr. Laurence Steinberg gave expert testimony regarding the status and substance of scientific research on adolescent brain development.  Cruz v. United States, Case No. 3:11-CV-00787 (JCH) (D. Conn.), Transcript of First Evidentiary Hearing ("Steinberg Tr.") (Doc. No. 111).  Among other things, Dr. Steinberg testified that 18-year-olds are similar to juveniles in terms of immaturity, impulsivity, susceptibility to peer pressure, and brain development.  See Steinberg Tr. at 19:6-23:4.

On March 29, 2018, this court held that Miller applies to 18-year-olds and granted Cruz's Petition.  Ruling at 56-57.  The court vacated Cruz's life sentences and subsequently resentenced him to 35 years imprisonment.  See Amended Judgment (Doc. No. 2118).

On September 11, 2020, the Second Circuit vacated this court's amended judgment and remanded the case for reinstatement of the prior judgment and sentence. Cruz v. United States, 826 F. App'x 49 (2d Cir. 2020).  Adhering to its decision in United States v. Sierra, 933 F.3d 95 (2d Cir. 2019), which was decided after Cruz's resentencing, the Second Circuit stated that "mandatory life sentences for individuals eighteen years old or older do not violate the Eighth Amendment."  Cruz, 826 F. App'x at 51.  Pursuant to the Second Circuit's Mandate (Doc. No. 2322), this court reinstated the original judgment imposing life imprisonment on March 16, 2021.  Reimposed Judgment (Doc. No. 2331).

---

[3] Both Cruz's original case and his habeas case were transferred to the undersigned upon the retirement of Judge Ellen Bree Burns.  Cruz v. United States, Case No. 3:11-CV-00787 (JCH) (D. Conn.), Order of Transfer (Doc. No. 48).  Judge Burns had the case transferred to her from the docket of Judge Alan H. Nevas at the time of his retirement from the court.  See United States v. Cruz, Case No. 3:94-CR-00112 (JCH) (D. Conn.) (unnumbered docket entry dated July 13, 2009).

Cruz now moves this court to reduce his sentence pursuant to section 3582(c) of title 18 of the United States Code.  Mot. for Compassionate Release Under the First Step Act ("Motion") (Doc. No. 2265); Mem. in Supp. of Compassionate Release Under Section 603(b) of the First Step Act ("Def.'s Mem.") (Doc. No. 2266).  He argues that his age at the time of his crimes, the length of his sentence, his extraordinary rehabilitation, the COVID-19 pandemic, and his family circumstances constitute "extraordinary and compelling reasons" to reduce his sentence under the statute.  See Def.'s Mem. at 1-4 (citing 18 U.S.C. § 3582(c)(1)(A)(i)).  The Government opposes Cruz's Motion.  Gov't Response to Def.'s Mot. for Compassionate Release ("Gov't Mem.") (Doc. No. 2304). On March 4, 2021, the court held a hearing on the Motion and subsequently took the matter under advisement.  Minute Entry (Doc. No. 2321).[4]

## III.    LEGAL STANDARD

As amended by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), section 3582(c)(1)(A) of title 18 of the United States Code grants district courts the authority to reduce an imposed term of imprisonment upon motion by the Director of the Bureau of Prisons ("BOP") or upon motion of the defendant.  18 U.S.C. § 3582(c)(1)(A).  A defendant may move for a reduction of his sentence under section 3582(c)(1)(A) only after he has "fully exhausted all administrative rights to appeal a

---

[4] The court notes that, at every proceeding in this case and the related habeas action, the family and friends of one victim, Tyler White, have attended.  White was only 22 years old and father to an infant daughter at the time of his murder.  See PSR 2018 ¶ 47; Gov't Mem. at 9 n.3.  The impact on his family has been enormous, as attested to by various relatives who have addressed the court, first at Cruz's sentencing, then at re-sentencing, and most recently at the hearing on the Motion under consideration. At the latest hearing, White's sister made particular note of the devasting and life-altering effect White's murder has had on his mother and father.

The court also notes that, although contacted by the United States Attorney's Office, the family of Arosmo Diaz has not attended any of the proceedings in this case or submitted any statements for the court's consideration.

failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  Id.

Under the statute, district courts may reduce a defendant's previously imposed sentence only if there are "extraordinary and compelling reasons" that warrant a sentence reduction and the sentence reduction is "consistent with applicable policy statements issued by the Sentencing Commission."  Id.  Congress has never defined the term "extraordinary and compelling reasons," except to state that "[r]ehabilitation . . . alone" does not suffice.  28 U.S.C. § 944(t).  However, the Second Circuit has recently clarified that, in exercising their discretion under the statute, district courts may consider, "whether in isolation or combination," "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release."  United States v. Brooker, 976 F.3d 228, 237-38 (2d Cir. 2020) (concluding that "[b]ecause Guideline § 1B1.13 is not 'applicable' to compassionate release motions brought by defendants [in contrast to those brought by the BOP], Application Note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling").

However, even where a court finds that "extraordinary and compelling reasons" warrant a sentence reduction, it must still "consider[ ] the factors set forth in section 3553(a) [of title 18 of the United States Code] to the extent that they are applicable."  18 U.S.C. § 3582(c)(1)(A).  A court may deny a defendant's motion if the court determines that the section 3553(a) factors override what would otherwise be "extraordinary and

compelling reasons" for a sentence reduction.  See United States v. Ebbers, 432 F.

Supp. 3d 421, 430-31 (S.D.N.Y. 2020).

## IV.   DISCUSSION

### A.   Exhaustion

As an initial matter, Cruz's Motion is properly before the court.  Section 3582(c)

requires the defendant to either fully exhaust his administrative remedies before the

BOP or wait 30 days after petitioning the warden of his facility before filing a motion in

court.  18 U.S.C. § 3582(c)(1)(A); see also United States v. Haney, 454 F. Supp. 3d

316, 321 (S.D.N.Y. 2020) (Rakoff, J.).

On July 20, 2020, Cruz asked the Warden of his facility to reduce his sentence

pursuant to section 3582(c).  Motion at 1.  The Warden denied Cruz's request.  See

Warden's Denial of Request for Sentence Reduction (Doc. No. 2265-1).

Cruz filed the instant Motion on October 24, 2020, well over than 30 days after

his initial request to the Warden on July 20, 2020.  Accordingly, Cruz has satisfied the

statutory requirement, and the court proceeds to the merits of his Motion.

### B.   Extraordinary and Compelling Reasons

In support of his Motion, Cruz advances several reasons which he argues,

"independently and certainly in combination", warrant the sentence reduction he seeks.

Def.'s Mem. at 3.  More specifically, he argues that his age at the time of his crimes, the

length of his sentence, his extraordinary rehabilitation, the COVID-19 pandemic, and his

family circumstances constitute "extraordinary and compelling reasons" under the

statute.  Id. at 1-4, 13-37.[5]  Having considered the arguments in Cruz's Motion and

accompanying Memorandum, as well as those in the Government's Opposition, the

court agrees that, taken together, the reasons laid out by Cruz are indeed "extraordinary

and compelling."

           1.      Age at Time of Offense and Length of Sentence

At Cruz's sentencing in 1996, the Sentencing Guidelines were mandatory and

called for a life sentence.  See supra at 3 n.2.  The court was not permitted to consider

age as a basis for imposing a sentence outside of the guideline range.  See U.S.

Sentencing Guidelines Manual § 5H1.1 (1995).  The Guidelines are now an advisory

factor under section 3553(a), United States v. Booker, 543 U.S. 233, 245 (2005), and

age is a permissible characteristic for the sentencing court to consider, U.S. Sentencing

Guidelines Manual § 5H1.1 (2018).

It is uncontroversial that age, specifically youth, bears on an individual's

blameworthiness in committing a criminal offense.  "The basis for this conclusion is too

obvious to require extended explanation."  Thompson v. Oklahoma, 487 U.S. 815, 835

(1988).  Because of their reduced cognitive, interpersonal, and emotional capabilities,

---

[5] Cruz advances two additional reasons that, in his view, warrant a reduction in his sentence. First, he argues that this case sits in an extraordinary posture given that the Government did not appeal the 35-year term of imprisonment this court imposed upon resentencing Cruz.  Def.'s Mem. at 14-15. Second, he argues that the judge who sentenced Cruz mistakenly believed that he was required to impose a sentence of life in prison.  As to the latter, court has already stated that this point has no bearing on its Ruling.  See supra note 2.

As to the former, the court agrees with the Government that this point is likewise irrelevant.  See Gov't Mem. at 24.  The Government appealed this court's decision on Cruz's habeas Petition and, pursuant to that appeal, the Second Circuit vacated this court's amended judgment and remanded the case for reinstatement of the original judgment.  The court has since reimposed that judgment.  The court does not view the Government's decision not to appeal the sentence itself as a concession that it agreed with that sentence.  The court thus rejects these additional reasons as bases for a reduction in Cruz's sentence.

children and adolescents are less blameworthy than mature adults when they engage in criminal behavior.

The Supreme Court has discussed these distinguishing characteristics of youth on several occasions.  In Roper v. Simmons, 543 U.S. 551 (2005), the Court identified "[t]hree general differences" that separate juveniles under 18 and adults in terms of blameworthiness.  First, juveniles tend to lack both maturity and a sense of responsibility, "often result[ing] in impetuous and ill-considered actions and decisions." Roper, 543 U.S. at 569.  Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure."  Id.  Third, "the character of a juvenile is not as well formed as that of an adult."  Id. at 570.  Based upon these differences, the Court held that the death penalty is unconstitutional for offenders under the age of 18.  See id. at 575.  Subsequently, in Miller v. Alabama, the Court again recognized these "three significant gaps between juveniles and adults," 567 U.S. at 471, in its holding that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments," id. at 465 (internal quotation marks omitted).

Of course, the Court's holding in Miller does not apply to Cruz, who was 20 weeks past his eighteenth birthday when he committed his offenses.  That holding under the Eighth Amendment is "explicitly limited" to defendants "under the age of 18." Cruz, 826 F. App'x at 52 (quoting Miller, 567 U.S. at 465); see also Cruz, 826 F. App'x at 51 ("[T]he Supreme Court has repeatedly drawn a bright line at age eighteen for Eighth Amendment limitations on sentencing.").

All the same, the distinguishing characteristics of youth acknowledged in Roper and Miller "do not disappear when an individual turns 18."  Roper, 543 U.S. at 574.  The line simply "must be drawn" somewhere.  Id.  However, that the Supreme Court has drawn this line at age 18 for purposes of the Eighth Amendment does not extinguish the relevance of these characteristics in assessing, as a general matter, an 18-year-old's blameworthiness in committing a crime.  Certainly, it does not require that this court ignore, in the context of the instant section 3582(c) motion for a sentence reduction, what is plain: a person 20 weeks past his eighteenth birthday exhibits the same hallmark characteristics of youth that make those under 18 less blameworthy for criminal conduct than adults.

The record developed in Cruz's habeas action amply supports this conclusion. As to the first characteristic identified by the Roper Court—"lack of maturity and an underdeveloped sense of responsibility" as manifest in "impetuous and ill-considered actions and decisions"—the scientific evidence before the court clearly established that the same traits are present in 18-year-olds.  See Roper, 543 U.S. at 569.  Cruz's evidence consisted of the expert testimony of Dr. Laurence Steinberg and scientific articles offered as exhibits.  See, e.g., Alexandra Cohen et al., When Does a Juvenile Become an Adult? Implications for Law and Policy, 88 Temple L. Rev. 769 (2016); Laurence Steinberg et al., Around the World, Adolescence is a Time of Heightened Sensation Seeking and Immature Self-Regulation, Developmental Science (2017).

In his testimony, Dr. Steinberg defined early adolescence as occurring between the ages of 10 and 13, middle adolescence between the ages of 14 and 17, and late adolescence between the ages of 18 and 21.  Steinberg Tr. at 11:5-11.  He

distinguished between two different decision-making processes: cold cognition, which occurs when an individual is calm and emotionally neutral, and hot cognition, which occurs when an individual is emotionally aroused, such as in anger or excitement. Id. at 9:13-10:15. Cold cognition relies mainly on basic thinking abilities while hot cognition also requires the individual to regulate and control his emotions. Id. at 10:16-21. While the abilities required for cold cognition are mature by around the age of 16, the emotional regulation required for hot cognition is not fully mature until the early- or mid-20s. See id. at 10:18-11:4, 69:20-70:7; see also Cohen et al., When Does a Juvenile Become an Adult?, at 786 (finding that, "relative to adults over twenty-one, young adults show diminished cognitive capacity, similar to that of adolescents, under brief and prolonged negative emotional arousal").

Dr. Steinberg also testified that late adolescents "still show problems with impulse control and self-regulation and heightened sensation-seeking, which would make them in those respects more similar to somewhat younger people than to older people." Steinberg Tr. at 19:21-25. For example, he testified that impulse control is still developing during the late adolescent years from age 10 to the early- or mid-20s. Id. at 20:16-21; see also Cohen et al., When Does a Juvenile Become an Adult?, at 780. Additionally, late adolescents are more likely to take risks than either adults or middle or early adolescents. See Steinberg Tr. at 20:1-15. According to Dr. Steinberg, risk-seeking behavior peaks around ages 17 to 19 and then declines into adulthood. Id.; see also Steinberg et al., Around the World, at 10 (graphing the trajectory of sensation-seeking behavior, as related to age, as an upside-down "U" with the peak at age 19).

The scientific evidence therefore demonstrates that 18-year-olds display similar characteristics of immaturity and impulsivity as juveniles under the age of 18.

The same conclusion can be drawn for susceptibility of 18-year-olds to outside influences and peer pressure, the second characteristic of youth identified in Roper. Dr. Steinberg testified that the ability to resist peer pressure is still developing during late adolescence. Steinberg Tr. at 20:22-21:3. Therefore, susceptibility to peer pressure is higher in late adolescence than in adulthood, but slightly lower in late adolescence than in middle adolescence. Id. Dr. Steinberg testified that, according to his research, up until the age of 24, people exhibit greater risk-taking and reward-sensitive behavior when in the presence of their peers. Id. at 24:14-25:15. Adults after the age of 24 do not exhibit this behavior, but rather perform the same whether they are by themselves or with their peers. Id. Therefore, like juveniles under the age of 18, 18-year-olds also experience similar susceptibility to negative outside influences.

Finally, on the third characteristic of youth identified in Roper—that a juvenile's character is not as well-formed as that of an adult—Dr. Steinberg testified that people in late adolescence are, like 17-year-olds, more capable of change than are adults. Id. at 21:4-12.

In sum, Dr. Steinberg testified that he is "absolutely confident" that a person's development along these lines is still ongoing in late adolescence, i.e., between the ages of 18 and 21. See id. at 61:3-62:4. In 2003, Dr. Steinberg co-wrote an article, the central point of which was that adolescents were more impetuous, were more susceptible to peer pressure, and had less fully formed personalities than adults. Id. at 22:2-11; see also Laurence Steinberg & Elizabeth Scott, Less Guilty by Reason of

Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychol. 1009 (2003).  The article focused on people younger than 18.  However, given the developments in scientific knowledge about late adolescence, Dr. Steinberg testified that, if he were to rewrite the article, he would say "the same things are true about people who are younger than 21."  See Steinberg Tr. at 22:12-24; see also id. at 13:18-14:25.

The court finds the scientific evidence just discussed to be persuasive and well-founded and concludes that, because 18-year-olds are still developing in terms of maturity, impulse control, ability to resist peer pressure, and character, they are less than fully blameworthy for criminal conduct.

Against this backdrop, the length of Cruz's sentence is striking.  In custody since he was 18 years old, Cruz, now 45, has spent roughly 60 percent of his entire life in prison.  Should he reach age 72, he will have spent 75 percent of his life behind bars, having served 54 years in prison.  The court views this as an unusually long sentence in light of Cruz's lessened blameworthiness due to his age at the time of his crimes.  That this is an unusually long sentence is further supported by the fact that the national average length of a federal sentence for murder over the past decade is approximately 22 years, far less than half of what Cruz will serve should he live to age 72.  See U.S. SENTENCING COMMISSION, FEDERAL SENTENCING STATISTICS: SECOND CIRCUIT tbl. 7 (2011-2020) (annual reports), available at https://www.ussc.gov/topic/data-reports.  The effect is that Cruz, who was less than fully blameworthy for his crimes given his age when he committed them, will end up serving significantly more time than adults who, fully blameworthy for their conduct, have committed the same crimes.  "This reality cannot

14

be ignored." Graham v. Florida, 560 U.S. 48, 70-71 (2010) ("Life without parole is an especially harsh punishment for a juvenile.  Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender.").

The court concludes that the tremendous length of Cruz's life sentence supports a reduction.  See Brooker, 976 F.3d at 238 (remarking that an overly long sentence may weigh in favor of a sentence reduction); United States v. Maumau, 2:08-CR-00758-TC-11, 2020 WL 806121, at *6 (D. Utah Feb. 18, 2020) (granting a section 3582(c) motion based on, inter alia, "the incredible length [55 years] of the mandatory sentence imposed"), aff'd, No. 20-4056, 2021 WL 1217855 (10th Cir. Apr. 1, 2021).

2.      Extraordinary Rehabilitation

While rehabilitation alone cannot support a section 3582(c) sentence reduction, 28 U.S.C. § 994(t), it may be considered in conjunction with other reasons.  As the Second Circuit recently noted in Brooker, extraordinary rehabilitation may "interact with" other circumstances to create extraordinary and compelling reasons for a sentence reduction.  See Brooker, 976 F.3d at 238.

The court's view of Cruz's life post-sentencing can be summed up in a single word: transformed.  A brief description of his life over the past 26 years, as he was incarcerated with no expectation of release, makes clear the basis for the court's view.[6]

It first bears noting that, after more than 26 years in BOP custody, including at both maximum- and minimum-security federal penitentiaries, and now low-security

---

[6] Counsel has submitted recent evidence concerning Cruz's prison record, on which the court relies.  The court also relies on the records submitted in support of Cruz's successive habeas corpus proceeding, Cruz v. United States, Case No. 3:11-CV-00787 (JCH) (D. Conn.).

facilities, see Cruz BOP Records (Doc. No. 2279-7), Cruz has never received a disciplinary ticket.[7]  Def.'s Mem. at 25.  Through dozens of crack re-sentencings, First Step Act re-sentencings, and now section 3582(c) motions during the COVID-19 pandemic, this court can recall only one other defendant (incarcerated 22 years) serving a comparable sentence with zero tickets.  It is not uncommon for an inmate to have a good record with the BOP, but there are almost always a few violations along the way.  In this regard, Cruz's BOP record is remarkable in the court's experience.

But Cruz has done more than just stay out of trouble: he has committed to bettering himself.  Cruz has taken more than 60 classes since 1997, including courses on parenting, self-esteem, public speaking, business, and finance.  See Individualized Reentry Plan (May 29, 2020) (Doc. No. 2266-5) at 2-3.  Cruz also completed a paralegal course on his own initiative, earning a certificate with honors.  Resentencing Transcript (Doc. No. 2127) at 106:19-107:3.  Having taken nearly every course offered, Def.'s Mem. at 25, Cruz began teaching a Fathers Behind Bars class as well as a victim impact course.  Cruz Tr. at 25:4-15.  Additionally, Cruz volunteers as a Spanish translator for religious services.  Letter from Pastor Joseph Rivera (Doc. No. 2111-3).  The church Pastor emphasized Cruz's steadfast support of younger inmates, and his desire to mentor them, warning them about the consequences of bad decisions.  Id.

---

[7] In the court's experience, it is unusual for a defendant convicted of murder to be confined in a low-security prison.  Many of Cruz's co-defendants, for example, are confined in medium- and high-security prisons.  See, e.g., Federal Bureau of Prisons, Find an Inmate (last visited Apr. 8, 2021), https://www.bop.gov/inmateloc/ (search results for Manuel E. Roman, Richard Morales, and Alexis Antuna showing that they are confined at high-, medium-, and high-security prisons, respectively).  That Cruz is confined at a low-security facility is further indication of his rehabilitation.

In addition, other than when he was transferred to Connecticut in connection with the habeas hearings and resentencing, Cruz has maintained a job with UNICOR.[8]  He is described by one of his supervisors as "one of the best" clerks she has ever supervised during her 20-year tenure with BOP.  See Letter from Shelby Cano (Jan. 18, 2014) (Doc. No. 37-2) at 4.  That same supervisor further remarked that Cruz has "continued to excel and grow, professionally and personally" in the years that she has known him. Id.  Another supervisor described him as dependable, respectful, and mature.  See Letter from Becky Reid (Doc. No. 37-2) at 10.

Based on Cruz's exemplary conduct while imprisoned for more than 26 years, and the steps he has taken to educate himself and guide others, the court concludes that his rehabilitation is truly exceptional and, in combination with the other reasons discussed in this section, supports a finding of extraordinary and compelling circumstances warranting a reduction in his sentence.

### 3.    COVID-19 Pandemic

Several courts have found, based on the ongoing COVID-19 pandemic, extraordinary and compelling reasons to reduce a life without parole sentence.  See, e.g., United States v. Rios, No. 3:94-CR-112 (JBA), 2020 WL 7246440 (D. Conn. Dec. 8, 2020); United States v. Rodriguez, No. 00 CR 761-2 (JSR), 2020 WL 5810161 (S.D.N.Y. Sept. 30, 2020).  This court has released numerous defendants serving terms of years because they had underlying medical conditions that increased their risk of death or severe illness due to COVID-19.  See, e.g., United States v. Hammond, Case

---

[8] Only 8 percent of work-eligible inmates can obtain a UNICOR position.  BOP, UNICOR Program Details (last visited Apr. 6, 2021), https://www.bop.gov/inmates/custody_and_care/unicor_about.jsp.

No. 3:13-CR-00043 (JCH) (D. Conn.), Order Granting Section 3582(c) Motion (Doc. No. 130).

Cruz argues that he is overweight (with a BMI of 27) and suffers from hypertension, and that these conditions support a finding of extraordinary and compelling circumstances.  Def.'s Mem. at 28-29.  Cruz's medical records, submitted under seal, support the presence of these conditions.  See Cruz Medical Records (Doc. No. 2269).

Previously, the Centers for Disease Control and Prevention ("CDC") identified both hypertension and being overweight (defined as a BMI greater than 25) as health conditions that "might" increase the risk of severe illness from COVID-19.  See CDC, People with Certain Medical Conditions (last updated Feb. 22, 2021), https://web.archive.org/web/20210301060842/https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (archived website). This was in contrast with, for example, obesity and coronary artery disease; the CDC had previously stated that people with these conditions "are at increased risk" of severe illness due to COVID-19.  Id.  This court has never viewed conditions that "might" increase of severe COVID-19 illness as, standing alone, sufficient to support a finding of extraordinary and compelling circumstances.

However, the CDC has recently changed the way it categorizes the illnesses on its underlying medical conditions list.  No longer does the CDC draw a distinction between conditions that "might" increase the risk of severe illness and those that certainly do.  Instead, the CDC now says that, as to the conditions listed by the agency, those conditions "can make you more likely" to experience severe illness.  See CDC,

People with Certain Medical Conditions (last visited Apr. 1, 2021),

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  Hypertension and being overweight are now classified as conditions that "can", rather than "might", make a person more likely to get severely ill from COVID-19.  Id.  This linguistic change from "might" to "can" may not appear noteworthy at first blush.  However, the court finds this change significant given that every illness previously classified as "are at increased risk" is now similarly categorized as a condition that "can make you more likely" to experience severe illness.  Id.  There is no indication that the CDC now views these conditions as less definitive risk factors. Thus, hypertension and being overweight have been elevated to more definitive risk factors, on par with age, obesity, diabetes, and chronic obstructive pulmonary disease. Significantly, this conclusion is further supported by the CDC's description of its list as "the list of underlying medical conditions that put adults of any age at high risk for severe illness" from COVID-19.  CDC, Evidence Used to Update the List of Underlying Medical Conditions That Increase a Person's Risk of Severe Illness from COVID-19 (last visited Apr. 1, 2021) (emphases added), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlying-evidence-table.html.

The court concludes that Cruz suffers from underlying medical conditions that increase his risk of severe illness if he contracts COVID-19.  In line with the court's previous decisions, this supports a finding of extraordinary and compelling circumstances standing alone.  See United States v. Hammond, Case No. 3:13-CR-00043 (JCH) (D. Conn.).  Certainly, it supports such a finding when considered in combination with the other factors in this section.

4.      Family Circumstances

Cruz's family circumstances further support a finding of compelling and

extraordinary reasons to reduce his sentence.  Cruz's mother, with whom he is

"exceptionally close", lives alone and is in deteriorating health.  See Def.'s Mem. at 33,

35.  She suffers from a terminal lung disease and has been given approximately six

months to live.  Affidavit of Dr. Patel (Mar. 17, 2021) (Doc. No. 2334).  The more than

300 pages of medical records for Mrs. Cruz, submitted under seal, amply support Dr.

Patel's Affidavit.

In his initial Memorandum, Cruz argued that his mother "need[s]" him to care for

her.[9]  Def.'s Mem. at 35.  The Government argued that there are others in Cruz's family

who could potentially care for his mother and that, as a result, there is no "immediate

and dire need" that would warrant a reduction in his sentence or release.  Gov't Mem. at

23.  Subsequently, Cruz clarified that he has three siblings who live in proximity to Mrs.

Cruz and, together with a health aide who visits for four hours each day, assist in her

care.  Sealed Response to Order (Doc. No. 2344) at 1-2.

The court agrees with the Government that Cruz would not be the only available

caregiver.[10]  However, the court is persuaded that Cruz could assist his mother in a way

---

[9] Cruz's father, who suffered from dementia, lived in a nursing home and died two days before the hearing on the pending Motion.

[10] Under the Sentencing Guidelines, a defendant's family circumstances constitute an extraordinary and compelling reason in the case of: (1) "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children"; or (2) "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."  U.S. Sentencing Guidelines Manual § 1B1.13 n.1(C) (2018).  Cruz cannot establish such a circumstance.  However, as Brooker makes clear, this provision of the Guidelines is applicable only to section 3582(c) motions made by the Bureau of Prisons; it does not apply to such motions brought by a defendant.  Brooker, 976 F.3d at 236 ("[I]f a [section 3582(c)] motion is not brought by the BOP Director, Guideline § 1B1.13 does not, by its own terms, apply to it.").

that no other person currently can.  Def.'s Mem. at 2.  Cruz avers that his mother lives alone, and cannot bathe, use the bathroom, or get out of bed on her own.  Id.  She has a health aide who visits daily to assist with these and other tasks, but who is with Mrs. Cruz for only four hours per day.  Id.  Moreover, while her three other children assist in her care when the health aide is not present, they are "often" unavailable.  Id.  Lastly, Cruz states that his mother spends nights alone and has, on occasion, fallen while attempting to use the bathroom on her own and been unable to get up for hours.  Id. The court agrees with Cruz that, as a live-in caregiver, he would be present in such emergency situations, a role currently unable to be filled by anyone else.  See id. at 2-3.

In sum, though Cruz's family circumstances do not, standing alone, amount to "extraordinary and compelling reasons", the court concludes that they are a factor that adds some support to such a finding.

### 5.    The Government's Arguments

In addition to arguing that, whether alone or in combination, the bases for Cruz's arguments are insufficient to support a finding of extraordinary and compelling reasons warranting a sentence reduction, the Government raises a separate argument that essentially attacks the Motion as a whole.  It argues that a section 3582(c) motion "is not a vehicle to relitigate" a successive habeas petition.  Gov't Mem. at 26.  The Government cites several cases in which courts have concluded that a section 3582(c) motion for sentence reduction was merely an attack on issues that were, or could have been, previously raised on direct appeal or in a habeas petition.  See Gov't Mem. at 13-14; see also United States v. Handerhan, 789 F. App'x 924 (3d Cir. 2019); United States v. Arojojoye, 806 F. App'x 475 (7th Cir. 2020); United States v. Rivernider, No. 3:10-CR-222 (RNC), 2020 WL 597393 (D. Conn. Feb. 7, 2020).

The court has reviewed these cases and concludes that they are quite unlike this one.  The defendant in each of these cases clearly sought to argue errors allegedly made by the sentencing court.

For example, in Handerhan, the defendant argued that various errors at sentencing entitled him to a sentence reduction under section 3582(c).  Handerhan, 789 F. App'x at 925-26.  The Third Circuit affirmed the district court's conclusion "that Handerhan's arguments stated potential grounds for relief only on direct appeal or under [section] 2255 and not under [section] 3582(c)(1)(A)."  Id. at 926.  In so doing, the court noted that section 3582(c) does not provide a means to challenge a sentence's validity, and questioned whether an alleged sentencing error that could have been previously addressed could ever constitute an "extraordinary and compelling reason" for a sentence reduction.  Id.; see also Rivernider, 2020 WL 597393, at *4 ("To my knowledge, nobody has suggested that the 'extraordinary and compelling' standard can be satisfied by claims of legal error or other alleged wrongs that are cognizable on direct appeal from a conviction or by means of a habeas corpus petition.").  Notably, the defendant in Handerhan had not raised any other grounds for finding extraordinary and compelling circumstances.

Similarly, in Arojojoye, the defendant argued that he was entitled to a sentence reduction because of a disparity between his sentence and that of a defendant with a similar record and criminal history.  Arojojoye, 806 F. App'x at 477.  The defendant had already made this argument on direct appeal and in a motion under section 2255.  Id. at 478.  The Seventh Circuit held that the defendant's motion was properly construed as a successive habeas motion because he was "really attacking the length of his sentence"

based on an error purportedly made at sentencing.  Id. at 477-78.  As in Handerhan, the defendant in Arojojoye raised no other grounds to support a finding of extraordinary and compelling circumstances.

These cases do not support the Government's argument that Cruz's Motion is essentially a successive habeas petition in disguise.  Gov't Mem. at 13-14, 26-27. While the successive Habeas Petition granted by this court was indeed a challenge—on Eighth Amendment grounds—to the length of his original sentence, the court does not view the instant Motion in that light.  Certainly, the court does not find "extraordinary and compelling reasons" based on any perceived error by the sentencing court.  Cruz's rehabilitation, his current family circumstances, and his risk of severe illness from COVID-19—factors on which the court relies—obviously do not call into question any aspect of his original sentence.  Further, the court does not find that the length of Cruz's sentence is "extraordinary and compelling" because it believes that the sentencing judge did not account for Cruz's age.  Indeed, the sentencing judge could not have considered Cruz's age under the Guidelines then in effect.  See U.S. Sentencing Guidelines Manual § 5H1.1 (1995); see also supra at 3 n.2.  Rather, the court concludes that Cruz's sentence is an "unusually long" one when viewed in the light of our increased understanding of late adolescent brain development and behavior, see Steinberg Tr. at 13:18-14:25, and Cruz's lessened blameworthiness and capacity to change given his age at the time he committed his crimes.  This is clearly a factor that can support a sentence reduction.  See Brooker, 976 F.3d at 238 (noting that the defendant's age at the time of his crime and length of sentence "might perhaps weigh in

favor of a sentence reduction");[11] S. Rep. No. 98-225, at 55-56 (1984) (noting that reduction may be appropriate when "other extraordinary and compelling circumstances justify a reduction of an unusually long sentence" (emphasis added)).

The court is, of course, aware that its decision on Cruz's Habeas Petition was reversed, resulting in the re-imposition of the original judgment. See Reimposed Judgment (Doc. No. 2331). However, Cruz is not barred from seeking relief under section 3582(c) based on, inter alia, age simply because he argued in an ultimately unsuccessful habeas petition that Miller extends, as a matter of constitutional law, to those who were 18 at the time of their crime. Certainly, it cannot be that Cruz is barred from raising an age-based argument now but would not have been had he never sought habeas relief (or had he only reversed the order in which he pursued these two different avenues of relief). The court finds no basis in section 3582(c) or case law for the argument that Cruz must forfeit his rights under section 3582(c) because he first sought habeas relief on an age-based constitutional ground.

* * *

Having considered the arguments made by Cruz and the Government, the court concludes that Cruz has demonstrated, through a combination of factors, extraordinary and compelling reasons under section 3582(c) for a reduction in his sentence.

C.    Factors Under Section 3553(a)

The presence of extraordinary and compelling reasons, however, is not the end of the analysis under section 3582(c). The court must also consider whether—and, if

---

[11] When the Brooker court noted this, it had before it a defendant who was 22 when he was convicted and sentenced (Cruz was 19) for conduct he engaged in starting at age 17 (Cruz joined the Latin Kings at 15).

so, how much of—a sentence reduction is appropriate in light of the factors set forth in

section 3553(a).  As relevant here, the section 3553(a) factors include "the nature and

circumstances of the offense"; "the history and characteristics of the defendant"; the

need for the sentence to "reflect the seriousness of the offense", "afford adequate

deterrence to criminal conduct", "protect the public from further crimes of the

defendant", and "provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner"; "the kinds of

sentence and the sentencing range established" by the Sentencing Guidelines in effect

at sentencing for this category of offense and defendant;[12] and "the need to avoid

unwarranted sentence disparities among defendants with similar records who have

been found guilty of similar conduct."  18 U.S.C. § 3353(a)(1), (2), (4)(A) & (6).

      1.     Seriousness / Nature and Circumstances of the Crime

The court recognizes the seriousness of the offense in this case, including the

nature and circumstances of Cruz's crimes.  There is no crime more serious than

murder.  The finality of ending another person's life, without any mitigating

circumstances, e.g., self-defense or negligence, and the consequent effect upon the

victim's loved ones is almost unspeakable.  There can be no question that murder must

be punished and punished severely.

Cruz murdered Diaz and White in cold blood.  He shot White twice into the back

of the head at point-blank range, and then held Diaz down as Antuna shot him until he

---

[12] As noted above, the Sentencing Guidelines in effect at the time of Cruz's sentencing were mandatory and called for life imprisonment for the VCAR murders.  See supra at 3 n.2.  While the court, in considering the section 3553(a) factors, recognizes the gravity of this previously mandated punishment, as well as the current Guideline range of life, the Guidelines are now an advisory factor under section 3553(a).  Booker, 543 U.S. at 245.  Moreover, the court considers Cruz's age at the time of his offense, as is now permitted under the current Guidelines.  U.S. Sentencing Guidelines Manual § 5H1.1 (2018).

was dead.  Though Cruz had been ordered by Latin King higher-ups to kill Diaz and believed that he would be at risk of mortal danger if he failed to carry out the order, see Cruz Tr. at 19:12-22, there was no such order to kill White, a friend of Diaz's who simply happened to be in the wrong place at the wrong time.  White's murder has irrevocably devasted his family.  See, e.g., Resentencing Tr. at 92:19-97:15.  No doubt the same is true for Diaz's family.  The need for Cruz's sentence to reflect the seriousness of his crimes, particularly in light of the circumstances surrounding those offenses, weighs very heavily in favor of a substantial sentence.

        2.       Avoiding Unwanted Sentence Disparities

When a court reduces a defendant's criminal sentence, it has the potential to create a disparity between that defendant and persons sentenced for similar conduct. Here, however, that would not be the case.

In fiscal year ("FY") 2020, the national average length of a federal sentence for murder was approximately 21 years, and the median sentence was approximately 19 years.  U.S. SENTENCING COMMISSION, PRELIMINARY FY20 4TH QUARTERLY SENTENCING UPDATE 9 (Jan. 4, 2021).  The numbers are not significantly different for FY 2019.  In that year, sentences for murder averaged just over 21 years nationally, and the median was 20 years.  U.S. SENTENCING COMMISSION, 2019 FEDERAL SENTENCING STATISTICS 11 (2020).  The average murder sentence in the Second Circuit was roughly 17 years in FY19.  Id.  In FY 1996, when Cruz was sentenced, the national average length of a sentence for murder was approximately 24.5 years, and the median sentence was approximately 22 years.  U.S. SENTENCING COMMISSION, 1996 FEDERAL SENTENCING STATISTICS 10 (1997).

In view of federal sentencing practices, the court concludes that reducing Cruz's life sentence, of which he has already served nearly 27 years, would not create an unwanted disparity between him and similar offenders.

### 3. Deterrence / Protection of the Public / Educational Training and Correctional Treatment

Though the future can never be predicted with certainty, the court is confident in concluding that Cruz no longer poses a danger to the public. Indeed, the evidence before the court demonstrates that, should he be released from incarceration, Cruz will be a productive member of society. Cruz was arrested in 1994 and sentenced to life without parole in 1996. Despite facing life in prison with no possibility of release, he has not received a single disciplinary ticket during his twenty-six years in incarceration. This is rare, indeed, especially for a defendant who, serving a life without parole sentence, has no motivation to earn good time credit by avoiding inappropriate conduct. Further, Cruz has taken nearly every course available to him and earned a paralegal certificate. Particularly noteworthy is his extensive participation in the Challenge Program, see PSR 2018 ¶ 118, an intensive cognitive-behavioral treatment program at high-security prisons "focuse[d] on the reduction of antisocial peer associations; promotion of positive relationships; increased self-control and problem solving skills; and development of pro-social behaviors." FEDERAL BUREAU OF PRISONS, DIRECTORY OF NATIONAL PROGRAMS 10 (2017). The Challenge Program "places a special emphasis on violence prevention." Id. Cruz participated in the Challenge Program for four years. PSR 2018 ¶ 118.

On February 16, 2016, Cruz's Unit Manager, Mr. Lee, wrote a letter regarding Cruz in connection with a BOP progress report. His letter is unparalleled among BOP

letters reviewed by the court.  Having seen and worked with Cruz over the course of

many years, Mr. Lee stated that Cruz has:

> fully dedicated himself to a new path in life and rehabilitation way before the recent national focus on prisoner rehabilitation began.  [Cruz] has a well documented and exemplary institutional programming record throughout the BOP.  It is also documented that he has not received any incident (disciplinary) reports in over 21 years and has been working in the prison factory since 2002, from which he received outstanding performance evaluations from his supervisors.  To say the least, it is impressive, especially when he was not required by policy to participate in any of these educational programs because he has his [high school] diploma and a plumbing vocational degree. . . .
>
> [Cruz] work[s] with me in the facilitation of the different courses provided in this institution which I'm in charge of providing.  Until [Cruz], there was a great majority of programs that were not available to the Spanish-only speaking population because of the language barrier but with [Cruz's] dedication to translate these [written and spoken] programs, the barrier to rehabilitation for those inmates has been removed.

Id. ¶ 125.  Mr. Lee closed his letter by saying that Cruz's focus while in prison has been

on his faith, his education, and working to either help or mentor other inmates.  Id.  Mr.

Lee stated that he has "no doubt [Cruz] can be successful in [mentoring youth] upon

release."  Id.

In addition, Cruz was evaluated by Jozlyn Hall, Ph.D, Psy.D, in 2019.  After

reviewing Cruz's relevant records and conducting psychological and neuropsychological

testing, Dr. Hall concluded:

> His positive adjustment and maturation are further supported by the results of psychological and neuropsychological testing which did not indicate current problems of emotional disturbance, deficits in coping with stress, problems with his self-conception, or ability to form sustaining interpersonal relationships.  He has a strong network of family support that will assist him in his post-release adjustment to life outside of prison. . . .  On a validated risk assessment instrument, his risk of future violence was appraised as low.  Given all of the above information and results it is highly unlikely that

Mr. Cruz would reoffend or become involved in the justice system in this manner again.

Mitigation Report by Dr. Jozlyn Hall (Doc. No. 2111-1).

Further, the BOP's evaluation of Cruz indicates that he presents a "minimum" level risk of recidivism.  See Male PATTERN Risk Scoring Sheet (Doc. No. 2266-3).

### 4.    Personal History and Characteristics

Cruz had a challenging upbringing.  He was born into an intact family, but his father had both a serious drinking addiction and mental health issues, and physically abused Cruz, his siblings, and his mother.  PSR 2018 ¶¶ 90-91, 110.  Cruz witnessed shootings; indeed, he saw someone get murdered when he was a young boy.  Id. ¶ 93. He himself was also a victim of violent crime, having been shot twice, assaulted on multiple occasions, and robbed at gunpoint when he was around 13 years old.  Id.

Other aspects of Cruz's life pre-incarceration were less troubling.  Cruz had (and continues to have) no history of drug use.  Id. ¶¶ 106-07.  He had zero criminal history points at the time of his sentencing and no arrest record.  See id. ¶¶ 82-83.  He also graduated from high school and had some work history before he was incarcerated at age 18.  Id. ¶¶ 116, 126-27.

Cruz's personal history and characteristics are also reflected in his life post-incarceration.  Indeed, Cruz's acceptance of responsibility for his crimes further demonstrates his personal growth and transformation over the past 26 years.  After his conviction, Cruz continued to deny any involvement in the murders of Tyler White and Arosmo Diaz.  At his sentencing in 1996, he lied both to the court and to White's family, stating several times that he did not kill White and Diaz and even denying that he was a member of the Latin Kings.  PSR 2018 ¶¶ 38-42.

Since that time, however, and consistent with his evident rehabilitation and growth, Cruz has accepted responsibility for the crimes he committed.  During the habeas proceeding, Cruz acknowledged that he was responsible for the murders of White and Diaz; that he shot White twice in the back of the head and then held Diaz down as Antuna shot him four times.  Cruz Tr. at 20:5-7, 49:3-53:1.  He again took full responsibility for his crimes during his resentencing following the habeas proceeding.  Resentencing Transcript at 64:10-67:19.  On both occasions, Cruz expressed deep remorse for his actions and demonstrated, as not all defendants do, that he understands the devastating and irrevocable impact those actions have wreaked on the victims' families.  See Cruz Tr. at 26:6-27:2; Resentencing Tr. at 64:13-20, 65:1-66:23, 67:4-7, 67:16-19.  In the court's view, Cruz's remarks were genuine and unequivocal, and reflect an honest appreciation for the lasting pain he has caused.

Finally, the court incorporates its discussion, see supra at 15-17, of Cruz's history and characteristics while imprisoned the last 26 years of his life.  That history, which reflects Cruz's personal characteristics, is extraordinary and weighs very heavily in Cruz's favor as a section 3553(a) factor.

\* \* \*

Having weighed and considered the section 3553(a) factors, the court concludes that a reduction in Cruz's sentence is appropriate in light of the extraordinary and compelling reasons discussed above.

## V.   CONCLUSION

After considering the section 3553(a) factors, the court concludes that there are extraordinary and compelling reasons warranting a sentence reduction in this case.  This court had previously found, after considering the section 3553(a) factors only, that

30

the appropriate sentence for Cruz was 35 years.  However, in light of all the bases supporting its finding of extraordinary and compelling reasons, especially the risk to Cruz posed by COVID-19 and his family circumstances, the court reduces his sentence on Counts 1, 2, 25, and 26 to a term of time served (approximately 31 years with good time credit), which is sufficient, but not greater than necessary, to achieve the purposes of sentencing and is responsive to the bases in the courts extraordinary and compelling finding.  The court places Cruz on special supervised release for a term of 5 years, followed by a 5-year term of supervised release on Counts 1, 2, 25, and 26 and a 3-year term of supervised release on Counts 24 and 27, to run concurrently.  A separate order will issue specifying the terms of the special, mandatory, and standard conditions to which Cruz will be subject on supervised release.  In addition, Cruz is ordered to quarantine for 21 days.  He may not leave his home for any reason except a medical emergency or at the direction of the U.S. Probation Office.  Custody is transferred to the United States District Court for the Middle District of Florida.

For the foregoing reasons, Cruz's Motion for Compassionate Release Under the First Step Act (Doc. No. 2265) is granted.  An order reflecting the court's decision will issue simultaneously.

**SO ORDERED.**

Dated at New Haven, Connecticut this 9th day of April 2021.


 /s/  Janet C. Hall
Janet C. Hall
United States District Judge